UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------X

JORGE ARANETA and STELLA ARANETA,

              Plaintiffs,             **MEMORANDUM AND ORDER**

       - against -             22 Civ. 2346 (NRB)

J.P. MORGAN CHASE BANK, N.A.,

              Defendant.

-------------------------------------X
**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**


    Plaintiffs Jorge and Stella Araneta (the "Aranetas" or "plaintiffs") brought suit against defendant JPMorgan Chase Bank, N.A. ("Chase") for violation of New York Banking Law § 335 ("§ 335" or "Section 335"), breach of a bailment agreement, breach of an implied bailment agreement, negligence, gross negligence, and conversion, arising out of allegations that Chase improperly drilled into four safe deposit boxes that it leased to plaintiffs and sold the contents of those boxes -- personal property worth approximately $8-10 million -- at a public auction.  See Plaintiff's First Amended Complaint (the "Amended Complaint" or "AC") ¶¶ 22-59, ECF No. 17.  Before the Court is Chase's motion to dismiss plaintiffs' § 335 claim on the ground that § 335 does not grant safe deposit box lessees a private right of action.  See ECF

Nos. 25-26 ("Def Br.").  For the following reasons, defendant's motion is granted.

## I.    BACKGROUND[1]

Starting in 2006, the Aranetas began leasing multiple safe deposit boxes from Chase branches in New York City, which they renewed annually.  AC ¶¶ 7-8, 10.[2]  Chase deducted payment directly from the Aranetas' Chase checking accounts.  Id. ¶ 10.  At various points, Chase mailed safe deposit box lease renewal invoices and bank statements reflecting payment to a New York address maintained by plaintiffs (the "New York Address")[3] and to Miami homes owned by Stella Araneta's brother (the "Miami Addresses").  Id. ¶¶ 8, 10-11, 15.  Ultimately, as of October 1, 2014, the Aranetas leased seven safe deposit boxes from Chase.  Id. ¶ 12.

---

[1] The following facts are drawn from the Amended Complaint and exhibits attached thereto and are accepted as true for the purposes of the Court's ruling on defendants' motion to dismiss.  When ruling on a motion to dismiss pursuant to Rule 12(b)(6), a district court may consider "the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings and matters of which judicial notice may be taken."  Samuels v. Air Transp. Local 504, 992 F.2d 12, 15 (2d Cir. 1993).

[2] Plaintiffs originally leased these safe deposit boxes from a Bank of New York retail branch.  Id. ¶ 7.  At the time, Chase and Bank of New York were engaged in an asset merger whereby Chase acquired Bank of New York's retail bank branches.  Id.  Plaintiffs were informed in August 2006 about the acquisition by Chase, and plaintiffs' four initial lease agreements bear Chase's name and logo.  Id. ¶¶ 7, 9-10.

[3] Although the Aranetas are not residents of New York, they have owned an apartment in New York City for more than 45 years, listed the New York Address in a June 2006 safe deposit box lease application, and defendant mailed lease renewal invoices to the New York Address between 2007 and 2009.  Id. ¶¶ 1-2, 8, 10.

On March 21, 2016, Chase mailed plaintiffs "final notices" regarding the renewal of two of the safe deposit boxes plaintiffs originally leased from Chase in 2006 and had renewed annually since then.  Id. ¶ 13.  Those notices stated that, if payments were not received from the Aranetas within sixty days, Chase would drill the safe deposit boxes open, take inventory of their contents, remove the contents of the boxes, and transfer the contents to a secure location.  Id.  However, neither notice was sent to the New York Address or the Miami Addresses (or any other address maintained by plaintiffs).  Instead, they were both mailed to a P.O. Box in Baton Rouge, Louisiana.  Id.  Plaintiffs do not maintain an address or P.O. box in Baton Rouge and never advised or authorized Chase to send notices to that P.O. Box.  Id.[4]

On February 17, 2017, Chase drilled open four of plaintiffs' safe deposit boxes and removed the contents therein.  Id. ¶ 16. Chase did not notify the Aranetas that it had drilled into these safe deposit boxes and removed their contents, nor did Chase inform plaintiffs as to any steps it took thereafter with respect to the their personal property.  Id.[5]

---

[4] Plaintiffs contend that the Baton Rouge P.O. Box actually belongs to Chase. Id. ¶ 14.

[5] Chase nonetheless continued assessing and deducting fees from plaintiffs' checking account for the lease renewal of a different safe deposit box.  Id. ¶ 17.

On October 11, 2019, the Aranetas personally visited a Chase branch office in New York City.  Id. ¶ 18.  At that meeting, a personal banker informed plaintiffs that their safe deposit boxes had been drilled open and their contents had been removed and transferred to a secure location in another city.  Id.  Plaintiffs made payments that day to renew their annual leases on three boxes and bring any past due amounts current.  Id.  In turn, the Chase representatives with whom they met assured the Aranetas that their personal property would be returned to the safe deposit boxes that Chase had previously drilled open.  Id.[6]

Despite these assurances, Chase scheduled an auction date for the sale of plaintiffs' property less than 10 months after the October 11, 2019 meeting and sold the contents of their safe deposit boxes at a public auction for a total of $552,700.00, all without notice to plaintiffs.  Id. ¶¶ 18, 21.  Plaintiffs allege that $552,700.00 represents a fraction of the actual value of the property mishandled by Chase and claim that their personal property has an estimated value of $8-10 million.  Id. ¶¶ 37, 42, 48, 53, Prayer for Relief.

On March 22, 2022, plaintiffs filed the instant action, which included five causes of action: bailment; breach of implied bailment; negligence; gross negligence; and conversion.  ECF No.

---

[6] During this visit, plaintiffs also authorized Chase in writing to change the mailing address on all of their accounts to the New York Address.  Id.

1.  Following Chase's answer on April 22, 2022, ECF No. 11, the Court held an Initial Pretrial Conference ("IPC") on May 9, 2022. Four days after the IPC, plaintiffs filed their First Amended Complaint -- the operative complaint -- which added a claim that Chase violated the notice, safe-keeping, and pre-opening and pre-sale requirements of New York Banking Law § 335.  AC ¶¶ 22-30. Defendant sought a pre-motion conference and permission to file a motion to dismiss the § 335 claim on May 25, 2022, ECF No. 19, and otherwise answered the Amended Complaint on May 27, 2022, ECF No. 21.  The Court held another conference on June 8, 2022 and thereafter granted defendant leave to file the instant motion to dismiss, which Chase did on June 29, 2022.  ECF No. 25.  Plaintiffs filed their opposition on July 22, 2022 ("Pl. Opp."), ECF No. 29, and Chase filed its reply on August 8, 2022 ("Def. Reply"), ECF No. 34.[7] While awaiting the Court's decision on the instant motion, the parties have been engaging in discovery.  See ECF Nos. 29, 35-46.

## II.  **LEGAL STANDARD**

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its

---

[7] The Court acknowledges that plaintiffs requested oral argument in their opposition memorandum.  See Pl. Opp.  However, given our holding and the purely legal nature of the argument, the Court determined that oral argument was not necessary under the circumstances.

face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted). A claim is considered plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. "[T]he [C]ourt is to accept as true all facts alleged in the complaint" and must "draw all reasonable inferences in favor of the plaintiff." Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007).

## III. **DISCUSSION**

This motion presents a single issue: does § 335 create a private right of action for safe deposit box lessees? We acknowledge at the outset that the Court has previously answered this question in the negative.[8] Nonetheless, we approach this issue anew without allegiance to our prior holding.

---

[8] In a footnote within Helfer v. JPMorgan Chase Bank, N.A., we wrote:

> Plaintiffs' reliance on New York Banking Law § 335 similarly fails. The law governs a bank's remedies to dispose of property when a safe deposit box lease is terminated. It would provide a bank with a defense against claims of lost property arising from the removal of a plaintiff's safe deposit box when the bank complies with the requirements of the statute. See Fouad v. Citibank, N.A., 146 Misc. 2d 1021, 553 N.Y.S.2d 577, 578–80 (N.Y. Sup. Ct. 1989); Golomb v. N. Fork Bank, 13 Misc. 3d 1214A, 824 N.Y.S.2d 754 (N.Y. Dist. Ct. 2006). But plaintiffs have not pointed the Court to, nor has the Court by its own research found, any case law suggesting that Banking Law § 335 creates a private cause of action for plaintiffs or otherwise adds obligations on the part of a bank to safeguard property for which it is not liable under the terms of the Lease. Thus, Chase's alleged non-compliance with the letter of Banking Law

As an initial matter, plaintiffs concede that § 335 "does not expressly confer a private right of action."  Pl. Opp. at 6.  We thus move directly to whether the statute implies the existence of such an action.

"[W]here a statute does not explicitly provide for a private right of action, 'we begin with the presumption that [the legislature] did not intend one' . . . and the party seeking the private remedy has the burden of establishing that one was intended."  Rubman v. Osuchowski, 163 A.D.3d 1471, 1474 (4th Dep't 2018) (quoting Jordan v. Chase Manhattan Bank, 91 F. Supp. 3d 491, 501 (S.D.N.Y. 2015), Bellikoff v. Eaton Vance Corp., 481 F.3d 110, 116 (2d Cir. 2007)) (alterations in original).  Thus, "[i]n the absence of an express private right of action, plaintiffs can seek civil relief in a plenary action based on a violation of the statute 'only if a legislative intent to create such a right of action is fairly implied in the statutory provisions and their legislative history.'"  Cruz v. TD Bank, N.A., 22 N.Y.3d 61, 70 (N.Y. 2013) (quoting Carrier v. Salvation Army, 88 N.Y.2d 298, 302 (N.Y. 1996)).  "In making the determination, [courts] ask: (1) whether the plaintiff is one of the class for whose particular benefit the statute was enacted; (2) whether recognition of a

---

§ 335 does not alter the Court's conclusion that plaintiffs' claims must be dismissed.

No. 19-cv-0008 (NRB), 2020 WL 6823240, at *6 n.4 (S.D.N.Y. Nov. 20, 2020).

private right of action would promote the legislative purpose; and (3) whether creation of such a right would be consistent with the legislative scheme." <u>Uhr ex rel. Uhr v. E. Greenbush Cent. Sch. Dist.</u>, 94 N.Y.2d 32, 38 (N.Y. 1999) (quoting <u>Sheehy v. Big Flats Cmty. Day, Inc.</u>, 73 N.Y.2d 629, 633 (N.Y. 1989)).  The New York Court of Appeals has "repeatedly recognized the third [factor] as the most important." <u>Cruz</u>, 22 N.Y.3d at 70.

For the reasons set forth herein, plaintiffs do not meet their burden on any of the three required prongs.

**A. Class for Whose Particular Benefit the Statute Was Enacted**

We must first evaluate whether plaintiffs are part of "the class for whose particular benefit the statute was enacted." <u>Uhr</u>, 94 N.Y.2d 38 (quoting <u>Sheehy</u>, 73 N.Y.2d at 629, 633).  Here, the parties dispute both the narrowness of the "particular benefit" test and its application to § 335.  Defendants argue that plaintiffs can only qualify as members of "the class for whose particular benefit the statute was enacted" if they are part of "the sole, or at least the primary, class for whose benefit the statute under which the implied private right of action is asserted was enacted." Def. Br. at 7-8 (citing <u>Flagstar Bank, FSB v. State</u>, 114 A.D.3d 138, 139-40, 144-45 (2d Dep't 2013), <u>Wenig Saltiel, LLP v. Specialized Loan Servicing, LLC</u>, 68 Misc. 3d 6, 8-10 (N.Y. App. Term 2020)).  They further contend that, although "there are procedural checkpoints in the statutory text of Section 335 that

could benefit lessees, the statute is plainly designed to benefit lessors (safe deposit businesses), not lessees." Def. Br. at 14. By contrast, plaintiffs argue that defendants misconstrue the "particular benefit" prong, which, according to a New York Court of Appeals decision, Sheehy v. Big Flats Community Day, Inc., is met when the statutory provision at issue is "unquestionably intended, at least in part" to benefit the class." Pl. Opp. at 6-7 (citing Sheehy, 73 N.Y.2d at 63) (emphasis added). Plaintiffs claim that they satisfy the first prong because § 335 contains language which "at least in part" protects safe deposit box lessees. See Pl. Opp. at 7-8.

We agree with defendants that the "particular benefit" test is not as broad as proposed by plaintiffs and that safe deposit box lessees are not the class for whose particular benefit § 335 was enacted.

Starting with the test itself, courts post-Sheehy have held that potentially "deriv[ing] a benefit from the statutory program at issue" is not enough for plaintiffs to constitute part of the class for whose particular benefit the provision was enacted. See Wenig, 68 Misc. 3d at 9; Davis v. Citibank, N.A., 116 A.D.3d 819, 822 (2d Dep't 2014) ("[A]lthough financially struggling homeowners may derive a benefit from the HAMP, that program was not promulgated solely for their particular benefit."); Flagstar, 114 A.D.3d 138, 139-40, 144-45 (plaintiff was not a "particular"

beneficiary of the statute even though it "undoubtedly st[ood] to benefit" from the statute at issue) (emphasis in original). Indeed, plaintiffs must "belong to the class for whose <u>specific benefit</u> the law was enacted." <u>Stray from Heart, Inc. v. Dep't of Health & Mental Hygiene of City of New York</u>, 20 N.Y.3d 946, 948 (N.Y. 2012) (emphasis added). Plaintiffs have also not put forth any case law to show that parties with conflicting interests can both be part of <u>the class</u> for whose <u>particular benefit</u> the statute was enacted. <u>See</u> Def. Reply at 2 (emphasis added). We therefore reject plaintiffs' argument that the first prong of our inquiry should be interpreted as broadly as they propose.

With respect to § 335 itself, "in any matter involving statutory construction, judicial inquiry begins with the text of the statute." <u>In re Adler, Coleman Clearing Corp.</u>, 263 B.R. 406, 474 (S.D.N.Y. 2001). Here, the first line of § 335 states: "[e]very <u>lessor</u> shall be entitled to the following special remedies . . . ." N.Y. Banking Law § 335 (emphasis added). Section 335(1) allows the <u>lessor</u> to drill open a safe deposit box if a lessee is delinquent on its fees, provided that the lessor complies with certain enumerated steps. Specifically, § 335(1):

- Requires lessees' rent payments to be at least one-year delinquent before the lease may be terminated, <u>id.</u> § 335(1)(a);

- Requires lessors to provide an additional 30 days-notice before the lessor may begin removing the lessee's contents, <u>id.</u>;

- Requires the lessor, upon opening a delinquent safe deposit, to inventory the contents and retain them for safekeeping for at least two additional years, id. § 335(1)(b);

- Provides the lessee an additional written notice following the opening and inventory of the safe deposit box contents, id. § 335(1)(c);

- Requires that any proceeds from the sale of the items in the lessee's safe deposit be kept for three years and provides that the proceeds are recoverable by the lessee within that timeline, id. § 335(1)(e); and

- Requires that the lessor keep "documents, letters or other papers of a private nature and any property of no apparent value" for "at least ten years," id. § 335(1)(f).

Section 335(2), however, clarifies that lessors may sell any bonds, stocks, or other securities or properties within deposit boxes "regardless of whether or not it shall appear from such securities or properties that the lessee of the safe deposit box possesses title to or any interest in such securities, or other properties, or power to transfer such title or interest." Id. § 335(2). Section 335(3) provides procedures for the lessor to collect interest or dividends on securities found in a safe deposit box and outlines the lessor's ability to collect reasonable expenses from safe-keeping and opening the safe deposit box. Id. § 335(3). Section 335(4) discusses a lessor's rights regarding a safe deposit box originally let by a predecessor in interest, a lessor which has been dissolved, or a lessor holding the contents of the safe deposit box. Id. § 335(4). And § 335(5) states: "this section

shall not preclude any other remedy . . . for the enforcement of the claims of the lessor against the person to whom a safe deposit box shall have been let, nor bar the right of the lessor to recover the debt due it in any other lawful manner." Id. § 335(5) (emphasis added).

Construed together, we read the above-referenced provisions as a framework of remedies designed primarily to benefit lessors. To be sure, § 335(1)'s requirements provide protections to lessees. However, as noted supra, merely standing to benefit from a statute is not enough to transform potential plaintiffs into "particular beneficiaries." See, e.g., Wenig, 68 Misc. 3d at 9; Davis, 116 A.D.3d 819, 822; Flagstar, 114 A.D.3d 138, 139-40, 144-45.

Section 335's legislative history does not contradict our understanding of the text. We agree with defendants that, over time, the bulk of amendments to § 335 have "filled voids or otherwise were pro-lessor measures, while maintaining sufficient safeguards for lessees." Def. Br. at 11; compare Def. Br. at 9-14 (identifying at least thirteen instances of legislative history indicating benefits for lessors); with Pl. Opp. at 10-11 (identifying three instances of legislative history indicating benefits for both lessors and lessees). The amendments to which plaintiffs cite also do not necessarily strengthen their case. Notably, plaintiffs rely on a 1958 New York Banking Department letter, which states that proposed amendments to § 335(1)(b)

"should be for such protection to the lessor and to the lessee." Pl. Opp. at 8; Letter from State of New York Banking Department, Bill Jacket, L. 1958, Ch. 879, at 41.   However, we interpret "should" to mean "shall" or "will" in the context of that particular paragraph, rather than "must" or "ought."   In other words, the author is stating that this specific amendment <u>will</u> benefit both the lessor and the lessee, not that the New York State Legislature (the "Legislature") <u>should</u> enact the amendment to benefit lessors and lessees equally.   <u>See</u> Letter from State of New York Banking Department, Bill Jacket, L. 1958, Ch. 879, at 41.[9]

In any event, as with the statutory text, the mere inclusion over time of some legislative amendments that add or strengthen procedural safeguards for parties "does not mean" that the statute was <u>designed</u> to benefit those parties.   <u>See</u> <u>Haar v. Nationwide Mut. Fire Ins. Co.</u>, 34 N.Y.3d 224, 230 (N.Y. 2019).   Legislative history therefore cannot save plaintiffs' position.

Accordingly, the Aranetas fail to satisfy this first prong, which alone precludes us from finding that § 335 implies a private right of action.   <u>See</u> <u>Ortiz v. Ciox Health LLC</u>, 37 N.Y.3d 353, 360

---

[9] Tellingly, the remainder of the paragraph in question discusses "prevent[ing] subsequent work involved in giving another notice [to a lessee] if he should not pay the money which became due between the giving of the notice and the time of payment," and notes that "[i]f the lessee was not interested in protecting his property by paying the accrued charges or removing the contents of the box, <u>the lessor should not be penalized</u> by compelling it to keep the contents of the box in one of the general safes or boxes."   <u>Id.</u> (emphasis added).

(N.Y. 2021) ("Critically, all three factors must be satisfied before an implied private right of action will be recognized[.]") (quoting Haar, 34 N.Y.3d at 229) (internal quotation marks omitted).  We nonetheless analyze the remaining two factors and conclude that they also do not support implying a private right of action.

**B. Promotion of the Legislative Purpose**

The second prong concerns whether recognizing a private right of action promotes the legislative purpose behind the statute at issue.  This analysis is itself "a two-part inquiry," which requires plaintiffs to establish "(1) what the Legislature was seeking to accomplish in enacting the statute; and (2) whether a private right of action promotes that objective." Rhodes v. Herz, 84 A.D.3d 1, 10 (1st Dep't 2011) (citing Uhr, 94 N.Y.2d at 38).

First, for the reasons stated above, we conclude that the Legislature primarily enacted § 335 to protect lessors and reduce litigation between lessors and lessees.  Indeed, the statutory text is focused on the "special remedies" to which a lessor is "entitled" when it did not otherwise enter into a contrary contract with a lessee.  See N.Y. Banking Law § 335.  With respect to legislative history, both parties agree that "the legislature paid careful attention to resolving ambiguities in the statute and reducing friction and litigation between lessors and lessees." Def. Br. at 15; Pl. Opp. at 10; Letter from State of New York

Banking Department, Bill Jacket, L. 1958, Ch. 879, at 41-42 (noting that certain amendments were intended to "avoid possible disputes between the lessor and lessee"). Yet as defendants note, the fact that the Legislature hoped to reduce friction between lessors and lessees is "a far cry from "turning a safe harbor _for_ lessees into a claim _against_ the lessors by lessees." Def. Reply at 9-10 (emphasis in original). At most, the Legislature expressed concern for lessees through the procedural safeguards in the statute, but there is little evidence that it intended for those lessees to maintain a private right of action that basis.

Second, a private right of action would not promote the legislative objective. Plaintiffs argue that it should be "properly assumed that the legislature included . . . duties for lessors [in the statutory text] because they expected them to be heeded." Pl. Opp. at 11-12. However, the New York Court of Appeals has cautioned against assuming that a private right of action exists based on implication alone. See Haar, 34 N.Y.3d at 231 ("[C]ourts typically do not rely on legislative silence to infer significant alterations of existing law on the rationale that legislative bodies generally do not 'hide elephants in mouseholes.'") (quoting Cruz, 22 N.Y.3d at 72, Whitman v. Am. Trucking Ass'ns, 531 U.S. 457, 468 (2001)). Likewise, the existence of common law remedies militates against implying a private right, because "we can infer that the legislature was

satisfied with existing common-law remedies, 'with which legislative familiarity [must be] presumed.'" See Haar, 34 N.Y.3d at 232 (quoting Burns Jackson Miller Summit & Spitzer v. Lindner, 59 N.Y.2d 314, 325 (N.Y. 1983)). Common law remedies are available here, and indeed plaintiffs are bringing five additional common law claims: breach of a bailment agreement, breach of an implied bailment agreement, negligence, gross negligence, and conversion. AC ¶¶ 31-59.[10]

Thus, plaintiffs also do not satisfy the second prong. Again, we could end our analysis here. However, because courts generally consider the third prong the "most critical," Carrier, 88 N.Y.2d at 302, we briefly address it as well.

## C. Consistent with the Legislative Scheme

The third prong is whether inferring a private right of action would be consistent with the legislative scheme. "Here, the relevant inquiry is whether the private right of action coalesces smoothly with the legislative goal, in particular with its enforcement mechanism, or whether it is completely at odds with

---

[10] Although we refrain from inferring that § 335 includes a private right of action, the safeguards included therein may nonetheless help protect lessees insofar as they are relevant to establishing violations of common law causes of action. See, e.g., Daggett v. Keshner, 284 A.D. 733, 735 (1st Dep't 1954) (Where a statute defining an act as wrongful is intended to benefit a limited class of which the injured person is not a member, "the violation of the statute . . . if otherwise relevant, is [still] evidence of negligence which the jury may consider in conjunction with all other relevant proven facts").

the same." Rhodes, 84 A.D.3d at 10 (citing Uhr, 94 N.Y.2d at 40).
This factor is "most important," because:

> the Legislature has both the right and the authority to
> select the methods to be used in effectuating its goals,
> as well as to choose the goals themselves.   Thus,
> regardless of its consistency with the basic legislative
> goal, a private right of action should not be judicially
> sanctioned if it is incompatible with the enforcement
> mechanism chosen by the Legislature or with some other
> aspect of the over-all statutory scheme.

Cruz, 22 N.Y.3d at 70-71 (internal quotation marks and citations
omitted).   Accordingly, if a court is to "imply such a right, [it]
must have clear evidence of the Legislature's willingness to expose
the [party] to liability that it might not otherwise incur." Uhr,
94 N.Y.2d at 42 (emphasis added).

Plaintiffs present no such clear evidence.   To the extent
that any enforcement mechanism is mentioned in § 335, it relates
solely to claims brought by the lessor.   See N.Y. Banking Law §
335(5) (stating that the provisions of Section 335 "shall not
preclude any other remedy by action or otherwise for the
enforcement of the claims of the lessor against the person to whom
a safe deposit box shall have been let") (emphasis added); id. §
335(4) (lessors that acquire deposit boxes of their predecessors
in interest "may have the remedies provided by [§ 335]" as to those
predecessor boxes and the contents thereof).

In addition, the Legislature has included express private
rights of action in other areas of the New York Banking Law, which

is a further indication that it did not intend for a private right of action to derive from § 335.  See, e.g., id. § 200-b ("An action or special proceeding against a foreign banking corporation may be maintained by a resident of this state for any cause of action."); id. § 676 ("No such banking organization . . . shall interpose the defense, in an action for recovery by a depositor of money paid upon an unauthorized signature . . . ."); see also Cruz, 22 N.Y.3d at 74 (private right of action was inconsistent with the legislative scheme when "recognition of such a right [would not] be compatible with the comprehensive enforcement mechanisms the legislature included elsewhere" in the statute at issue).[11]  And crucially, as Chase notes, "each time a court has been presented with whether an implied private right of action exists under any section of the New York Banking Law, the court has declined to find one."  Def. Br. at 19–20 (collecting cases).  Plaintiffs have not presented any authority to the contrary.

In sum, plaintiffs fail on all three prongs of our inquiry. Lessees are not part of the class for whose particular benefit the statute was enacted; recognizing a private right of action would not promote the legislative purpose behind § 335; and implying a

---

[11] We note that the New York Banking Law contains an administrative supervisory and enforcement structure, see Def. Br. at 18, which also weighs against finding a private right of action.  See Cruz, 22 N.Y.3d at 70 (Court of Appeals has "declined to recognize a private right of action in instances where [t]he Legislature specifically considered and expressly provided for enforcement mechanisms' in the statute itself") (internal quotation marks omitted).

private right of action would be inconsistent with the overall legislative scheme.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, the Court grants Chase's motion to dismiss Count One of the First Amended Complaint, <u>i.e.</u>, plaintiffs' claim under New York Banking Law § 335.  <u>See</u> ECF No 17 ¶¶ 22-30. The Clerk of Court is respectfully directed to terminate the motion pending at ECF No. 25.


**SO ORDERED.**

DATED:    New York, New York
          March 22, 2023

                                     _____
                                     NAOMI REICE BUCHWALD
                                     UNITED STATES DISTRICT JUDGE